# EXHIBIT A

***DEFENDANTS' NOTICE OF FILING OF NOTICE OF REMOVAL OF ACTION FROM STATE COURT***

STATE OF MINNESOTA                                      DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT

---

Sven Sundgaard,                                    Court File No. _____

           Plaintiff,

v.                                                          **SUMMONS**

Multimedia Holdings Corporation, d/b/a
KARE-TV and d/b/a KARE 11; TEGNA, Inc.,

           Defendant.

---

THIS SUMMONS IS DIRECTED TO DEFENDANT MULTIMEDIA HOLDINGS CORPORATION:

1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2. **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons a **written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

   BAILLON THOME JOZWIAK & WANTA LLP
   100 South Fifth Street, Suite 1200
   Minneapolis, MN 55402

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

1

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: March 25, 2021

s/ Joni M. Thome
Joni M. Thome
Bar No. 232087
Frances E. Baillon
Bar No. 028435X
*Attorneys for Plaintiff*
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Fax: (612) 252-3571
jthome@baillonthome.com
fbaillon@baillonthome.com

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

---

Sven Sundgaard,

        Plaintiff,

v.

Multimedia Holdings Corporation, d/b/a
KARE-TV and d/b/a KARE 11; TEGNA, Inc.,

        Defendant.

Court File No. _____

**SUMMONS**

---

THIS SUMMONS IS DIRECTED TO DEFENDANT TEGNA, INC.:

1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2. **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons a **written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

   BAILLON THOME JOZWIAK & WANTA LLP
   100 South Fifth Street, Suite 1200
   Minneapolis, MN 55402

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: March 25, 2021

s/ Joni M. Thome
Joni M. Thome
Bar No. 232087
Frances E. Baillon
Bar No. 028435X
*Attorneys for Plaintiff*
BAILLON THOME JOZWIAK & WANTA LLP
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Fax: (612) 252-3571
jthome@baillonthome.com
fbaillon@baillonthome.com

2

STATE OF MINNESOTA                            DISTRICT COURT

COUNTY OF HENNEPIN                     FOURTH JUDICIAL DISTRICT

---

Sven Sundgaard,                          Court File No. _____

            Plaintiff,

                                **COMPLAINT AND**
v.                                              **JURY DEMAND**

Multimedia Holdings Corporation, d/b/a
KARE-TV and d/b/a KARE 11; TEGNA, Inc.

            Defendants.

---

      The Plaintiff, Sven Sundgaard ("Plaintiff" or "Sundgaard"), for his Complaint against

Defendants, states and alleges as follows:

### PARTIES, JURISDICTION & VENUE

1.      Plaintiff resides in the County of Hennepin, State of Minnesota.

2.      Defendant Multimedia Holdings Corporation is a South Carolina corporation with a

principal place of business at 7950 Jones Branch Drive, McLean, Virginia, 22107.

3.      Defendant TEGNA is a Virginia corporation headquartered in Tyson, Virginia. TEGNA

owns KARE TV. Its studios are located at 8811 Olson Memorial Hwy, Golden Valley, MN 55427. KARE

TV also operates under KARE-11. KARE-TV is a television station providing local news and general

interest programming in the Twin Cities and greater Minnesota television market.

4.      At all relevant times to this action, Plaintiff and Defendants were "employee" and

"employer," respectively within the meaning of Minn. Stat. § 363A.03.

5.      The Court has personal jurisdiction over the parties because Plaintiff is domiciled in

Minnesota, Defendants conduct business in Minnesota, and the alleged unlawful employment actions at

issue occurred in Minnesota.

6.      Venue is proper in Hennepin County pursuant to Minn. Stat. § 542.09. Defendants have employees, including Plaintiff, in Hennepin County, does substantial business in Hennepin County. Plaintiff worked for Defendants in the Hennepin County, State of Minnesota, and the unlawful acts alleged herein occurred in the Hennepin County, State of Minnesota.

## FACTS

7.      TEGNA and then General Manager, John Remes, hired Sundgaard as a meteorologist and weather reporter in 2006.

8.      Sundgaard was a long-term employee who consistently performed well and met or exceeded expectations.

9.      Moreover, Sundgaard developed a solid brand and a large following among viewers.

10.     Sundgaard is a gay, Jewish man.

11.     Initially, Sundgaard was not open about his sexual orientation at work out of fear as to how management would treat him. As time went on, Sundgaard became more comfortable and confident in his role, and in approximately 2007 or 2008, he began to disclose his sexual orientation to some coworkers and members of management.

12.     In 2010, Sundgaard converted to Judaism. He took part in a ceremony conducted by three rabbis in a religious court. He was open about his Judaism at work and was occasionally asked questions about Judaism that left him feeling uncomfortable.  For example, News Director, Jane Helmke, asked Sundgaard if as a Jew, he still believed Jesus was the Messiah. The invasive comment made Sundgaard very uncomfortable and he was unsure how to respond.

13.     In the spring of 2007 Sundgaard appeared on the cover of Lavender magazine as part of a promotion for Dining Out for Life, benefiting the Aliveness Project, an organization that serves people living with HIV/AIDS for the purpose of promoting healthy lives.

2

14.     In response to seeing Sundgaard on the cover of the magazine, then News Director Tom Lindner ("Lindner") was irate. He called Sundgaard and furiously demanded, "What are people going to think?"

15.     Rather than allow himself to be degraded, Sundgaard responded, "What *are* people going to think, Tom?"

16.     Sundgaard reported Lindner's hostile comment to Human Resources Director Sue Reimer ("Reimer"), but never received any follow up.

17.     In or around late March of 2011, Lindner sent Sundgaard a hostile email regarding a promotional photoshoot Sundgaard had done, copying many coworkers.

18.     Sundgaard went to Lindner's office to discuss the email, asking why Lindner had not discussed the issues with Sundgaard personally before publishing the hostile information to his coworkers.

19.     The conversation escalated and ended with Lindner screaming, "Get the fuck out of my office!"

20.     Lindner's office door was open. Many of Sundgaard's coworkers and superiors, including then–Evening News Producer Jen Young, heard Lindner's screaming and watched Sundgaard exit his office.

21.     Again, Sundgaard reported the incident to Reimer, and again, Reimer failed to follow up.

22.     Approximately four weeks later, Lindner was dismissed. TEGNA did not disclose to Sundgaard or publish the reason for Lindner's dismissal.

23.     On several more occasions throughout Reimer's tenure, Sundgaard reported similar incidents of differential treatment toward him based in part, on his sexual orientation and prior reports of discrimination or harassment. No matter how many times he reported, the hostility and differential treatment continued. For example, unlike other meteorologists, TEGNA rejected his requests to attend

3

conferences to maintain his status with the American Meteorological Society, delayed responding to requests for time off, and demanded to know his whereabouts at all times.

24.     Sundgaard knew that other meteorologists and journalists were regularly approved to attend conferences and events.  These events often included travel and lodging expenses.

25.     Unlike his coworkers, Sundgaard paid his own expenses for travel to conferences and other events.

26.     Sundgaard was made to account for his work time so that management could determine whether he was working "his full shift."  Group Human Resource Director Nikki Mills ("Mills") regularly questioned Sundgaard's schedule and told him to provide an accounting of his time and activities.  In 2017, when Mills was issuing Sundgaard a disciplinary warning Sundgaard noted to Mills that other employees and anchors were not held to the same standards.  He told Mills that under the law, she could not apply different standards to him.  She replied, "we are not talking about them."  Remes was in the conversation and remained silent.

27.     In or around August 2017, the National Lesbian and Gay Journalists Association (NLGJA) invited Sundgaard to speak on a panel at a conference.

28.     The panel was specifically about being LGBTQ and working as a meteorologist.

29.     By this time, Sundgaard was nationally known as a meteorologist and out gay man that had worked in the business for many years.

30.     Sundgaard had other similar opportunities in the past, but they were never considered by management.

31.     Nevertheless, Sundgaard believed this was an important opportunity and that it was consistent with TEGNA's written commitment to diversity.

4

32.    Around this same time, Sundgaard's mother's birthday was approaching. His mother had been diagnosed with and was going through treatment for late-stage cancer. Sundgaard and his family feared that it would be the last birthday he would celebrate with her.

33.    Approximately one month before the conference and within days of his being invited to speak at the conference, Sundgaard informed Helmke that he had been invited to the conference and requested time off to attend to be a part of the panel discussion.

34.    Around the same time, Sundgaard requested time off to spend time with his mother for her birthday.

35.    On August 7, 2017, Sundgaard and Helmke exchanged emails regarding his request.

36.    Helmke denied the request to attend and present at the conference on grounds that the station did not have the funds or staffing to send Sundgaard. Helmke told Sundgaard that TEGNA corporate had already arranged for another member of KARE 11's on-air talent, a woman, to attend the conference. Sundgaard had reason to believe that the reasons he was given for TEGNA denying his request were unfounded and illegitimate.

37.    Nevertheless, Sundgaard persisted in trying to get the station to approve his time away for the conference. Sundgaard offered to arrange for and pay his own way to the conference. He also suggested potential staffing solutions for Helmke to consider.

38.    Helmke denied the request again.

39.    Frustrated, Sundgaard suggested that he would speak with someone in the corporate office. Helmke responded that it was not a corporate decision, but a station decision, and that he could speak with Remes about his concerns. Sundgaard questioned the value of speaking with Remes and thought Helmke's decision raised corporate-level concerns about TEGNA's company policies and commitments to diversity.

5

40.     At the same time, Helmke told Sundgaard that there was not enough staff to approve his request for time off to be with his mother. Sundgaard reiterated his need for family leave to be with his dying mother and for time off to attend the conference.

41.     Less than ten days later, on August 16, 2017, TEGNA issued Sundgaard a warning for alleged insubordinate and unacceptable behavior directed toward Helmke. The warning also advised Sundgaard that to the extent he needed leave to spend time with his mother, he would need to make a request thirty days in advance unless it was an emergency. The warning was issued by Helmke, Remes, and Mills.

42.     On or around August 22, 2017, Sundgaard emailed Helmke, Remes, and Mills disputing the warning and reporting his concerns regarding its retaliatory animus.

43.     Specifically, Sundgaard reported his concern that his attempts to highlight TEGNA's supposed commitment to diversity made Helmke nervous.

44.     Sundgaard further explained that based on KARE 11's prior pattern of mistreatment toward him, he believed that Helmke did not want him to speak at the conference about his experience at KARE 11 as a publicly gay on-air personality.

45.     Sundgaard reported that he had experienced "mistreatment, double standards, and singling out" throughout his tenure at the station. Sundgaard noted that he received this warning only after he brought up concerns about diversity and inclusion and after the scheduling issue was resolved. Sundgaard suggested that the warning was an attempt by Helmke to intimidate him out of reporting up the chain, including to TEGNA corporate.

46.     In the end, TEGNA determined that there was sufficient staff for him to attend the conference and approved his request for time off.

6

47.    Sundgaard's mother passed away just hours before he was to leave for the conference, so ultimately, he was unable to attend.

48.    Less than three months later, on November 20, 2017, Remes, Helmke, and Mills issued Sundgaard a final written warning.

49.    This warning alleged that Sundgaard exercised "poor judgment" when four days earlier, during a newscast, he commented on a story about whether Minnesota or Wisconsin had more lakes. At the end of the story in which it was explained that even though Wisconsin has no limit as to the size of a body of water it counts as a lake, Minnesota still has more lakes, Sundgaard commented with a statement to the effect of, "Hmm, I guess size really does matter."

50.    Cohosts and other staff in the studio laughed and nodded in agreement.

51.    According to the warning, Sundgaard's "sexually loaded" comment was "disrespectful" to the audience and the brand and created an uncomfortable environment for his cohosts.

52.    None of Sundgaard's cohosts or other staff ever expressed discomfort about the comment at the time it was made or thereafter. In fact, his coworkers expressed disbelief that he was reprimanded about it at all.

53.    Less than two months after the November 2017 writeup, TEGNA ran and posted a story about an error made regarding uniforms that had been ordered for the Minneapolis Super Bowl volunteers.

54.    The story was titled, "Size Matters: Crew 52 Volunteers Struggle with Ill Fitting Swag." This story is still online at www.kare11.com/article/sports/nfl.

55.    Moreover, about two months prior to the November 2017 writeup, TEGNA posted an article titled, "Does Size Matter: Twitter Trolls Tiny Engagement Ring." This story is also still online at www.kare11.com/video/entertainment/buzz60.

7

56.     After the meeting at which Sundgaard was issued the November 2017 writeup, Sundgaard told Mills that he was not going to be treated and be terminated like Kim Insley ("Insley").

57.     Insley was a well-known KARE 11 anchor for twenty-four years before being dismissed without explanation other than that the station wanted to "go in a new direction." At the time of her termination, Insley was fifty-six years old. Many viewers believed she was dismissed due to age discrimination, and the topic was widely discussed by viewers online and by other news outlets. Defendants publicly noted in reference to Insley's departure, "This is in no way a reflection of Kim's many talents." Insley's departure became known in mid-October.

58.     Station management, including Remes and Mills, knew about the public and internal chatter regarding discrimination against Insley, as Insley had been terminated just weeks prior to this final warning issued to Sundgaard. Mills knew that Sundgaard's comment referred to his desire not to be discriminated against.

59.     Sundgaard received no other discipline until his termination in May 2020.

60.     He performed very well, received positive performance reviews, and continued to receive constant positive feedback from a large community following.

61.     At the same time, however, viewers harassed Sundgaard based on his sexual orientation. He was routinely threatened and subjected to hostility in posts and comments on Facebook, Twitter and other social and news venues. The harassment and hostility directed at Sundgaard was frequent and public. TEGNA did nothing to attempt to protect Sundgaard or condemn the hostility. This continued throughout Sundgaard's employment.

62.     Sometime in 2018, TEGNA conducted an anonymous survey that revealed severe cultural issues with the work environment at KARE 11. It hired a consultant to investigate the workplace culture.

8

63.     The consultant assembled employee focus groups and held quarterly meetings to address the issues. The consultant asked Sundgaard to have a one-on-one conversation with her and Sundgaard welcomed the opportunity telling her that he had, "a lot to say." The scheduled meeting was cancelled due to a snowstorm. Sundgaard asked to reschedule but he never heard back from the consultant.

64.     In or around October 2018, Director of Content Stuart Boslow ("Boslow") spoke with Sundgaard about a tweet he had posted. Sundgaard had retweeted a post by NBC's 'Meet the Press' Moderator Chuck Todd that criticized Donald Trump. Sundgaard added, "It's time to stop making excuses for Trump & fascism - we're really in a test of our democracy & facts & science…."

65.     A few days after this post, Boslow casually invited Sundgaard into his office and told him that he was not being given any kind of warning or discipline, but that he had been told to talk with Sundgaard about the post since Trump was referred to by name. The conversation was light and amicable.

66.     Soon after, Boslow followed up via email with Remes, Mills, and News Director, Stacey Nogy ("Nogy") to report on the conversation. Boslow mischaracterized the nature and tenor of the conversation.

67.     Boslow wrote to Remes, Mills and Nogy that the two discussed Sundgaard's alleged history of similar behavior and past discipline for it, and that Sundgaard acknowledged his violation of station policy.

68.     No discussion of any past conduct occurred in that meeting and no discussion of station policy was had.

69.     Throughout Sundgaard's employment, TEGNA inconsistently applied its social media policies.

70.     TEGNA's Social Media Policies forbid posting, reposting, sharing, or retweeting "anything that could compromise TEGNA's reputation," as well as "comments that include discriminatory

9

remarks, harassment, threats of violence or similar content." These guidelines apply to all TEGNA employees.

71.      According to some policies, news and editorial employees are not allowed to post political commentary without prior management approval and must clearly label such posts as opinion or commentary. The policy also encourages news and editorial employees to consider whether their posts are "true, fair, necessary, and informative," and condemns personal attacks and abusive language.

72.      Management, as well as on-air talent, have repeatedly violated such policies through their own posts and by "liking" others' posts indicating their approval. This includes but is not limited to liking posts and videos featuring nude women, describing anti-LGBTQ people as "insolent adults whining...", criticizing NBC for using the word "protest" rather than "riot" in the wake of the George Floyd killing, criticizing Minnesota Governor Tim Walz and Mayor Jacob Frey's responses to the protests, praising Donald Trump's State of the Union address and referring to Nancy Pelosi as an "embarrassment and a "national disgrace."

73.      Other TEGNA employees who have and continue to publicly engage with social media in apparent violation of TEGNA's alleged policies have not been disciplined and remain employed by TEGNA.

74.      On or around April 19, 2020, Sundgaard reposted a post written by his rabbi, Michael Adam Latz ("Rabbi Latz") on Facebook. Rabbi Latz commented on the COVID-19 stay-at-home order protests referring to some of the Michigan protesters as "nazi sympathizers" and "armed extremists."

75.      Rabbi Latz's comment was based on anti-Semitic protest signs. As Jewish men, Rabbi Latz and Sundgaard are sensitive to these matters and take their historical importance very seriously.

76.      During approximately the next eleven days, the repost did not receive much attention from the public.

10

77.     On or around April 29, 2020, a conservative news outlet published the repost, mischaracterizing the facts and berating Sundgaard.

78.     In a post on the Reopen Minnesota Facebook group, the administrator posted with the hashtag "#FireSven" and provided the KARE 11 phone number for members of the group to call.

79.     Other members of the group posted about flooding KARE 11's Facebook, boycotting the network, and even contacting advertisers to put pressure on the station.

80.     As a result, Sundgaard received a slew of threats and brazenly homophobic comments and messages on social media.

81.     The frenzy quickly escalated to a public condemnation on Twitter by a former congressman. This person referred to Sundgaard's repost as "idiocy" and called for TEGNA to fire him.

82.     The same night, Sundgaard removed the repost from his Facebook page.

83.     The next day, April 30, 2020, Mills and Boslow called Sundgaard about the repost. Boslow asked Sundgaard what he was thinking.

84.     Sundgaard responded that as Jewish men, Sundgaard and Rabbi Latz are sensitive to these issues, and Rabbi Latz does not use the word "nazi" lightly. He explained that the issue Rabbi Latz's post addressed was not the protests condemning the stay-at-home orders, but the protest signs displaying swastikas and comparing Jews to rats captioned with the statement, "that's the real plague."

85.     Sundgaard explained to Mills and Boslow that the negativity surrounding the post was incited by alt-right groups eleven days after he reposted and was directed at him personally.

86.     Sundgaard told Boslow and Mills that he feared for his safety because he had received threats of physical harm. He quoted some of the hateful messages and offered to forward them.

87.     Sundgaard expressed regret about the repost and told Boslow and Mills he would be sticking to posting about weather from then on. He told them he never wanted to be targeted by these groups again and he was willing to discuss a remedy that would stop the hostility.

88.     The next day Remes summarily dismissed Sundgaard.

89.     On May 1, 2020, Remes called Sundgaard, along with Boslow and Mills. Remes read Sundgaard's termination letter aloud, claiming Sundgaard's repost allegedly violated TEGNA policies.

90.     Sundgaard responded that he was planning on resigning in response to the current situation because of the organization's pattern of failing to support him in past instances of discrimination, as well as its decision to placate far-right/alt-right fringe groups rather than stand behind a long-time employee.

91.     Sundgaard also noted that Defendants did not apply its social media or other policies uniformly among its employees. Finally, Sundgaard told TEGNA that it should expect to hear from his lawyer.

92.     Just thirty minutes later, TEGNA publicly announced Sundgaard's termination on Facebook.

93.      The post stated: "Due to continued violations of KARE 11's news ethics and other policies, we have made the decision to part ways with Sven Sundgaard. We hope you continue to turn to KARE 11 for your news, traffic, weather, and more."

94.     The statement was not only facially false, but the result was that viewers were led to believe that Sundgaard had behaved unethically or worse, several times and continuously.

95.     Sundgaard demanded TEGNA remove the post, but TEGNA did not respond.

96.     Just hours after it was published, other news outlets reported on Sundgaard's termination and circulated TEGNA's post.

97.     The re-publishing prompted more comments and discussion online. Within the week, coverage of the story was global.

98.     TEGNA's public announcement of Sundgaard's separation was unprecedented and a departure from customary practice in its content and in the manner and to whom it was communicated.

99.     Never during Sundgaard's employment with TEGNA did it terminate another employee in such a public and damaging manner.

100.    There is no known history of TEGNA publishing such detailed alleged reasons for separations—true or untrue. In fact, in December 2020, after terminating an employee, Nogy told the press "I'm sorry, but we don't comment on personnel issues."

101.    TEGNA's enforcement of its social media policies on Sundgaard was unprecedented and a departure from customary practice.

**COUNT I**
**SEXUAL ORIENTATION DISCRIMINATION**
**IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT**

102.    Plaintiff re-alleges all preceding paragraphs of this Complaint.

103.    Defendants, by and through employees, managers, and officials acting within the scope of their employment and on behalf of Defendants, unlawfully discriminated against Plaintiff in violation of Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq*. These practices include, but are not limited to, terminating Plaintiff's employment, subjecting Plaintiff to a hostile environment and altering the terms and conditions of his employment because of his sexual orientation.

104.    Defendants' conduct constitutes discrimination in employment on the basis of sexual orientation in violation of Minn. Stat § 363A.01 *et seq*.

105.    Defendants' discriminatory actions adversely affected Plaintiff's status as an employee and ultimately led to Plaintiff's termination.

13

106.    Defendants failed to take all reasonable steps to prevent discrimination against Plaintiff from occurring.

107.    Defendants' discriminatory actions were intentional and performed with malice and/or reckless indifference to Minnesota's anti-discrimination laws that protect Plaintiff.

108.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other serious damage.

## COUNT II
## SEXUAL ORIENTATION HOSTILE ENVIRONMENT
## IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

Plaintiff re-alleges all preceding paragraphs of this Complaint.

109.    Defendants, by and through employees, managers, and officials acting within the scope of their employment and on behalf of Defendants, unlawfully subjected Plaintiff to hostility and threats based upon his sexual orientation. Defendants failed to provide a work environment free from animus directed at Plaintiff based upon his sexual orientation.

110.    Defendants' conduct and its failures to act constitutes violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.*

111.    Defendants' actions and inactions adversely affected Plaintiff's status as an employee and ultimately led to Plaintiff's termination.

112.    Defendants failed to take all reasonable steps to prevent discrimination against Plaintiff from occurring.

113.    Defendant's discriminatory actions were intentional and performed with malice and/or reckless indifference to Minnesota's anti-discrimination laws that protect Plaintiff.

14

114.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other serious damages.

## COUNT III
## REPRISAL IN VIOLATION OF
## THE MINNESOTA HUMAN RIGHTS ACT

115.    Plaintiff re-alleges all preceding paragraphs of this Complaint.

116.    Defendants by and through managers and employees acting on behalf of Defendants and within the scope of their employment, retaliated against Plaintiff in violation of the Minnesota Human rights Act, Minn. Stat. 363A.01 *et seq.* These practices include, but are not limited to, engaging in retaliatory conduct like reprimanding Plaintiff, inhibiting his professional development, terminating Plaintiff's employment, departing from customary employment practices, publishing false, damaging statements about Plaintiff because of Plaintiff's good faith reports to Defendants of discrimination and harassment in violation of the Minnesota Human Rights Act.

117.    Defendants' unlawful and retaliatory employment practices and actions were intentional and were performed by Defendants with malice and/or reckless indifference to the anti-discrimination laws which protect Plaintiff.

118.    Defendants failed to take all reasonable steps to prevent retaliation against Plaintiff from occurring.

119.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other serious damages.

## COUNT V
## DEFAMATION

120.  Plaintiff re-alleges all preceding paragraphs of this Complaint.

121.  Defendants' actions constitute defamation and defamation per se.

122.  Defendants, by and through employees, managers, and officials acting within the scope of their employment and on behalf of Defendants, published a false, defamatory statement about Plaintiff to third parties.

123.  This includes, statements made on May 1, 2020, when Defendants publicly stated that Plaintiff had ended Sundgaard employment because he "continued to engage in violations of KARE 11's news ethics and other policies" within his profession, journalism.

124.  Defendants' actions were intentional and intended to harm Plaintiff in his profession.

125.  Defendants' actions were performed with actual malice, malice and/or reckless indifference to Plaintiff's right not to be defamed under Minnesota common law.

126.  Defendants refused to remove the false and defamatory statement from social media and permitted the false allegations to permeate social media and news media worldwide.

127.  As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other serious damages and has harmed Plaintiff's reputation and lowered Plaintiff in the estimation of the community.

## PRAYER FOR RELIEF

Therefore, Plaintiff requests that judgment be entered against Defendants for the following:

a.      Declaring that Defendants' acts or omissions described in this Complaint constitute violations of applicable federal and state laws which protect Plaintiff;

b.      Enjoining Defendants and its employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries and all other persons acting in concert or participation with it, from its unlawful acts;

c.      Requiring Defendants to make Plaintiff whole for its adverse, retaliatory, and discriminatory actions with compensatory damages and with interest of an appropriate inflation factor;

d.      Plaintiff be awarded front pay and the monetary value of any employment benefits to which he would have been entitled to as an employee of Defendants;

e.      Plaintiff be awarded compensatory damages in an amount to be established at trial;

f.      Plaintiff be awarded damages for mental and emotional anguish and suffering, humiliation, embarrassment, shame, and loss of enjoyment of life in an amount to be established at trial;

g.      Plaintiff be awarded punitive damages as provided by statute in an amount to be established at trial;

h.      Plaintiff be awarded treble damages pursuant to the Minnesota Human Rights Act;

i.      Awarding Plaintiff attorneys' fees, costs, and disbursements pursuant to statute; and

j.      Granting other and further relief as the Court deems fair and equitable.

17

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS.

Dated: March 25, 2021                    BAILLON THOME JOZWIAK & WANTA LLP

                                         _s/ Joni M. Thome_____
                                         Joni M. Thome
                                         Bar. No. 232087
                                         Frances E. Baillon
                                         Bar No. 028435X
                                         *Attorney for Plaintiff*
                                         100 South Fifth Street, Suite 1200
                                         Minneapolis, MN  55402
                                         Telephone: (612) 252-3570
                                         Facsimile: (612) 252-3571


ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney's fees may be awarded pursuant to Minn. Stat. § 549.211 to the party against whom the allegations in this pleading are asserted.


Dated: March 25, 2021                    _s/ Joni M. Thome_____
                                         Joni M. Thome

18