## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

SVEN SUNDGAARD,

               Plaintiff,

    v.

MULTIMEDIA HOLDINGS
CORPORATION, d/b/a KARE-TV and
d/b/a KARE-11; TEGNA, Inc.,

               Defendants.

Case No. 1:21-cv-00999


**DEFENDANTS' ANSWER AND
AFFIRMATIVE DEFENSES TO
PLAINTIFF'S COMPLAINT**

---

Defendants MULTIMEDIA HOLDINGS CORPORATION, a licensee of KARE-TV and d/b/a KARE 11[1] and TEGNA Inc.[2], by and through their attorneys, Seyfarth Shaw, LLP, hereby submits their Answer to Plaintiff's Complaint and Jury Demand and Affirmative Defenses.

## PARTIES, JURISDICTION & VENUE

**COMPLAINT ¶1:**

Plaintiff resides in the County of Hennepin, State of Minnesota.

**ANSWER:**  On information and belief, Defendants admit the allegation in Paragraph 1 of the Complaint.

**COMPLAINT ¶2:**

Defendant Multimedia Holdings Corporation is a South Carolina corporation with a principal place of business at 7950 Jones Branch Drive, McLean, Virginia, 22107.

---

[1] Multimedia Holdings Corporation is incorrectly listed in Plaintiff's caption as "d/b/a KARE-TV and d/b/a KARE-11."
[2] TEGNA Inc. is incorrectly listed in Plaintiff's caption as "TEGNA, Inc."

**ANSWER:**  Defendants admit that Multimedia Holdings Corporation is a South Carolina corporation with a principal place of business and headquarters in the State of Virginia. Defendants deny the remaining allegation in Paragraph 2 of the Complaint.

**COMPLAINT ¶3:**

Defendant TEGNA is a Virginia corporation headquartered in Tyson [sic], Virginia.  TEGNA owns KARE TV.  Its studios are located at 8811 Olson Memorial Hwy, Golden Valley, MN 55427.  KARE TV also operates under KARE-11.  KARE-TV is a television station providing local news and general interest programming in the Twin Cities and greater Minnesota television market.

**ANSWER:**  Defendants admit that TEGNA Inc. ("TEGNA") is a Virginia corporation, headquartered in Tysons, Virginia.  Defendants admit that KARE-TV does business as KARE-11, that its studios are located at 8811 Olson Memorial Hwy, Golden Valley, Minnesota 55427, and that KARE-TV is a television station providing local news and general interest programming in the Twin Cities and greater Minnesota television market. Defendants deny the remaining allegations in Paragraph 3 of the Complaint.

**COMPLAINT ¶4:**

At all relevant times to this action, Plaintiff and Defendants were "employee" and "employer," respectively within the meaning of Minn. Stat. § 363A.03.

**ANSWER:**  Defendants admit that Plaintiff meets the definition of "employee" in Minn. Stat. § 363A.03 and that Defendants meet the definition of "employer in § 363A.03. Defendants deny that TEGNA employed Plaintiff.

**COMPLAINT ¶5:**

The Court has personal jurisdiction over the parties because Plaintiff is domiciled in Minnesota, Defendants conduct business in Minnesota, and the alleged unlawful employment actions at issue occurred in Minnesota.

**ANSWER:**  Defendants admit that the United States District Court for the District of

Minnesota has personal jurisdiction over the parties.  Defendants deny the remaining

allegations in Paragraph 5 of the Complaint.

**COMPLAINT ¶6:**

Venue is proper in Hennepin County pursuant to Minn. Stat. § 542.09.
Defendants have employees, including Plaintiff, in Hennepin County, does substantial
business in Hennepin County.  Plaintiff worked for Defendants in the Hennepin County,
State of Minnesota, and the unlawful acts alleged herein occurred in the Hennepin
County, State of Minnesota.

**ANSWER:**  Defendants admit the allegations in Paragraph 6 of the Complaint with

respect to venue within the United States District Court for the District of Minnesota,

which is within in Hennepin County.

## FACTS

**COMPLAINT ¶7:**

TEGNA and then General Manager, John Remes, hired Sundgaard as a
meteorologist and weather reporter in 2006.

**ANSWER:**  Defendants admit that Multimedia Holdings Corporation and then President

and General Manager, John Remes ("Remes") hired Plaintiff as a Meteorologist/Weather

Reporter in 2006.  Defendants deny the remaining allegations in Paragraph 7 of the

Complaint.

**COMPLAINT ¶8:**

Sundgaard was a long-term employee who consistently performed well and met
or exceeded expectations.

**ANSWER:** Defendants deny the allegations in Paragraph 8 of the Complaint.

**COMPLAINT ¶9:**

Moreover, Sundgaard developed a solid brand and a large following among viewers.

**ANSWER:** Defendants admit that Plaintiff developed a brand with a viewer following.

Defendants lack knowledge or information sufficient to form a belief about the truth of

the remaining allegations in Paragraph 9 of the Complaint.

**COMPLAINT ¶10:**

Sundgaard is a gay, Jewish man.

**ANSWER:** On information and belief, Defendants admit the allegations in Paragraph 10

of the Complaint.

**COMPLAINT ¶11:**

Initially, Sundgaard was not open about his sexual orientation at work out of fear as to how management would treat him. As time went on, Sundgaard became more comfortable and confident in his role, and in approximately 2007 or 2008, he began to disclose his sexual orientation to some coworkers and members of management.

**ANSWER:** Defendants admit that at some point during his employment, Plaintiff

publicly disclosed his sexual orientation. Defendants lack knowledge or information

sufficient to form a belief about the truth of the remaining allegations in Paragraph 11 of

the Complaint.

**COMPLAINT ¶12:**

In 2010, Sundgaard converted to Judaism. He took part in a ceremony conducted by three rabbis in a religious court. He was open about his Judaism at work and was occasionally asked questions about Judaism that left him feeling uncomfortable. For example, News Director, Jane Helmke, asked Sundgaard if as a Jew, he still believed Jesus was the Messiah. The invasive comment made Sundgaard very uncomfortable and he was unsure how to respond.

**ANSWER:**  Defendants admit that in 2017 Plaintiff alleged to Group Human Resources Director Nikki Mills ("Mills") that former News Director Jane Helmke ("Helmke") asked him if he believed Jesus was the Messiah.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 12 of the Complaint.

**COMPLAINT ¶13:**

In the spring of 2007 Sundgaard appeared on the cover of Lavender magazine as part of a promotion for Dining Out for Life, benefiting the Aliveness Project, an organization that serves people living with HIV/AIDS for the purpose of promoting healthy lives.

**ANSWER:**  Defendants admit the allegations in Paragraph 13 of the Complaint.

**COMPLAINT ¶14:**

In response to seeing Sundgaard on the cover of the magazine, then News Director Tom Lindner ("Lindner") was irate.  He called Sundgaard and furiously demanded, "What are people going to think?"

**ANSWER:**  Defendants admit that in 2017 Plaintiff alleged to Mills the allegations listed in Paragraph 14 of the Complaint.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 14 of the Complaint.

**COMPLAINT ¶15:**

Rather than allow himself to be degraded, Sundgaard responded, "What *are* people going to think, Tom?"

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 15 of the Complaint.

**COMPLAINT ¶16:**

Sundgaard reported Lindner's hostile comment to Human Resources Director Sue Reimer ("Reimer"), but never received any follow up.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 16 of the Complaint.

**COMPLAINT ¶17:**

In or around late March of 2011, Lindner sent Sundgaard a hostile email regarding a promotional photoshoot Sundgaard had done, copying many coworkers.

**ANSWER:**  Defendants admit that then News Director Tom Lindner ("Lindner") and Plaintiff corresponded via email in March 2011 regarding web scripts for *Simply Science* and that coworkers were copied on the emails.  Defendants deny the remaining allegations in Paragraph 17 of the Complaint.

**COMPLAINT ¶18:**

Sundgaard went to Lindner's office to discuss the email, asking why Lindner had not discussed the issues with Sundgaard personally before publishing the hostile information to his coworkers.

**ANSWER:**  Defendants admit that Lindner and Plaintiff had a discussion in Lindner's office.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 18 of the Complaint.

**COMPLAINT ¶19:**

The conversation escalated and ended with Lindner screaming, "Get the fuck out of my office!"

**ANSWER:**  Defendants admit that during that conversation Lindner made the alleged statement.  Defendants deny the remaining allegation in Paragraph 19 of the Complaint.

**COMPLAINT ¶20:**

Lindner's office door was open.  Many of Sundgaard's coworkers and superiors, including then—Evening News Producer Jen Young, heard Lindner's screaming and watched Sundgaard exit his office.

**ANSWER:**  Defendants admit that individuals in the newsroom were aware Lindner and

Plaintiff were having a conversation and that Plaintiff left Lindner's office.  Defendant

lacks knowledge or information sufficient to form a belief about what News Producer Jen

Young heard or witnessed.  Defendant denies the remaining allegations in Paragraph 20

Complaint.

**COMPLAINT ¶21:**

Again, Sundgaard reported the incident to Reimer, and again, Reimer failed to follow up.

**ANSWER:**  Defendants admit that Plaintiff reported this to Human Resources.

Defendants deny the remaining allegation in Paragraph 21 of the Complaint.

**COMPLAINT ¶22:**

Approximately four weeks later, Lindner was dismissed.  TEGNA did not disclose to Sundgaard or publish the reason for Lindner's dismissal.

**ANSWER:**  Defendants admit Lindner's employment with the Station ended on January

1, 2012 and that Defendants did not disclose the reason.  Defendants deny the remaining

allegations in Paragraph 22 of the Complaint.

**COMPLAINT ¶23:**

On several more occasions throughout Reimer's tenure, Sundgaard reported similar incidents of differential treatment toward him based in part, on his sexual orientation and prior reports of discrimination or harassment.  No matter how many times he reported, the hostility and differential treatment continued.  For example, unlike other meteorologists, TEGNA rejected his requests to attend conferences to maintain his status

with the American Meteorological Society, delayed responding to requests for time off, and demanded to know his whereabouts at all times.

**ANSWER:**  Defendants admit Plaintiff made complaints to former Human Resources

Director Sue Reimer ("Reimer") during his employment.  Defendants deny the remaining

allegations in Paragraph 23 of the Complaint.

## COMPLAINT ¶24:

Sundgaard knew that other meteorologists and journalists were regularly approved to attend conferences and events.  These events often included travel and lodging expenses.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 24 of the Complaint.

## COMPLAINT ¶25:

Unlike his coworkers, Sundgaard paid his own expenses for travel to conferences and other events.

**ANSWER:**  Defendants deny the allegations in Paragraph 25 of the Complaint.

## COMPLAINT ¶26:

Sundgaard was made to account for his work time so that management could determine whether he was working "his full shift."  Group Human Resource Director Nikki Mills ("Mills") regularly questioned Sundgaard's schedule and told him to provide an accounting of his time and activities.  In 2017, when Mills was issuing Sundgaard a disciplinary warning Sundgaard noted to Mills that other employees and anchors were not held to the same standards.  He told Mills that under the law, she could not apply different standards to him.  She replied, "we are not talking about them."  Remes was in the conversation and remained silent.

**ANSWER:**  Defendants admit that Helmke issued Plaintiff a disciplinary warning on

August 16, 2017 and that Mills, Helmke, and Plaintiff met to discuss the same.

Defendants admit that Plaintiff complained about the warning.  Defendants deny the

remaining allegations in Paragraph 26 of the Complaint.

**COMPLAINT ¶27:**

In or around August 2017, the National Lesbian and Gay Journalists Association (NLGJA) invited Sundgaard to speak on a panel at a conference.

**ANSWER:**  On information and belief, Defendants admit the allegations in Paragraph 27 of the Complaint.

**COMPLAINT ¶28:**

The panel was specifically about being LGBTQ and working as a meteorologist.

**ANSWER:**  On information and belief, Defendants admit the allegations in Paragraph 28 of the Complaint.

**COMPLAINT ¶29:**

By this time, Sundgaard was nationally known as a meteorologist and out gay man that had worked in the business for many years.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 29 of the Complaint.

**COMPLAINT ¶30:**

Sundgaard had other similar opportunities in the past, but they were never considered by management.

**ANSWER:** Defendants deny the allegations in Paragraph 30 of the Complaint.

**COMPLAINT ¶31:**

Nevertheless, Sundgaard believed this was an important opportunity and that it was consistent with TEGNA's written commitment to diversity.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 31 of the Complaint about what Plaintiff "believed."

**COMPLAINT ¶32:**

Around this same time, Sundgaard's mother's birthday was approaching. His mother had been diagnosed with and was going through treatment for late-stage cancer. Sundgaard and his family feared that it would be the last birthday he would celebrate with her.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 32 of the Complaint as to what Plaintiff and his family believed. On information and belief, Defendants admit the remaining allegations in Paragraph 32 of the Complaint.

**COMPLAINT ¶33:**

Approximately one month before the conference and within days of his being invited to speak at the conference, Sundgaard informed Helmke that he had been invited to the conference and requested time off to attend to be a part of the panel discussion.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation in Paragraph 33 of the Complaint as to the date Plaintiff was invited to speak at the conference. Defendants admit the remaining allegations in Paragraph 33 of the Complaint.

**COMPLAINT ¶34:**

Around the same time, Sundgaard requested time off to spend time with his mother for her birthday.

**ANSWER:** Defendants admit the allegation in Paragraph 34 of the Complaint.

**COMPLAINT ¶35:**

On August 7, 2017, Sundgaard and Helmke exchanged emails regarding his request.

**ANSWER:** Defendants admit the allegation in Paragraph 35 of the Complaint.

**COMPLAINT ¶36:**

Helmke denied the request to attend and present at the conference on grounds that the station did not have the funds or staffing to send Sundgaard. Helmke told Sundgaard that TEGNA corporate had already arranged for another member of KARE 11's on-air talent, a woman, to attend the conference. Sundgaard had reason to believe that the reasons he was given for TEGNA denying his request were unfounded and illegitimate.

**ANSWER:** Defendants admits that Helmke informed Plaintiff that she did not have the

budget or staff to approve his request because the Station had already approved another

member of KARE 11's team to attend the conference. Defendants deny the remaining

allegations in Paragraph 36 of the Complaint.

**COMPLAINT ¶37:**

Nevertheless, Sundgaard persisted in trying to get the station to approve his time away for the conference. Sundgaard offered to arrange for and pay his own way to the conference. He also suggested potential staffing solutions for Helmke to consider.

**ANSWER:** Defendants admit that Plaintiff continued to request that the Station send

him to the conference. Defendants deny the remaining allegations in Paragraph 37 of the

Complaint.

**COMPLAINT ¶38:**

Helmke denied the request again.

**ANSWER:** Defendants admit the allegation in Paragraph 38 of the Complaint.

**COMPLAINT ¶39:**

Frustrated, Sundgaard suggested that he would speak with someone in the corporate office. Helmke responded that it was not a corporate decision, but a station decision, and that he could speak with Remes about his concerns. Sundgaard questioned the value of speaking with Remes and thought Helmke's decision raised corporate-level concerns about TEGNA's company policies and commitments to diversity.

**ANSWER:**  Defendants admit that Plaintiff asked to speak to corporate and that Helmke

responded that it was not a corporate decision, but a Station decision and suggested that

Plaintiff discuss the same with Remes.  Defendants admit that the Plaintiff questioned her

suggestion.   Defendants lack of knowledge or information sufficient to form a belief

about the truth of whether Plaintiff was frustrated or what Plaintiff thought as set forth in

the remaining allegations in Paragraph 39 of the Complaint

**COMPLAINT ¶40:**

At the same time, Helmke told Sundgaard that there was not enough staff to
approve his request for time off to be with his mother.  Sundgaard reiterated his need for
family leave to be with his dying mother and for time off to attend the conference.

**ANSWER:**  Defendants deny the remaining allegations in Paragraph 40 of the

Complaint.

**COMPLAINT ¶41:**

Less than ten days later, on August 16, 2017, TEGNA issued Sundgaard a warning
for alleged insubordinate and unacceptable behavior directed toward Helmke.  The
warning also advised Sundgaard that to the extent he needed leave to spend time with his
mother, he would need to make a request thirty days in advance unless it was an
emergency.  The warning was issued by Helmke, Remes, and Mills.

**ANSWER:**  Defendants admit that Helmke issued Plaintiff a disciplinary warning on

August 16, 2017 and that Mills and Helmke met with Plaintiff to issue him the warning.

Defendants admit that the warning explained the policy for giving notice and requesting

FMLA leave other than exigency leave.  Defendants deny the remaining allegations in

Paragraph 41 of the Complaint.

**COMPLAINT ¶42:**

On or around August 22, 2017, Sundgaard emailed Helmke, Remes, and Mills
disputing the warning and reporting his concerns regarding its retaliatory animus.

**ANSWER:**  Defendants admit Plaintiff delivered a written complaint to Mills addressed to Helmke, Remes, and Mills on August 22, 2017 disputing the August 16, 2017 warning and that Plaintiff complained to Mills that he was being retaliated against and singled out and targeted because he was openly gay.  Defendants deny the remaining allegations in Paragraph 42 of the Complaint.

**COMPLAINT ¶43:**

Specifically, Sundgaard reported his concern that his attempts to highlight TEGNA's supposed commitment to diversity made Helmke nervous.

**ANSWER:**  Defendants admit Plaintiff made the allegations set forth in Paragraph 43 of the Complaint in his August 22, 2017 complaint.

**COMPLAINT ¶44:**

Sundgaard further explained that based on KARE 11's prior pattern of mistreatment toward him, he believed that Helmke did not want him to speak at the conference about his experience at KARE 11 as a publicly gay on-air personality.

**ANSWER:**  Defendants admit that Plaintiff complained to Mills on August 22, 2017 that he was being retaliated against and singled out and targeted because he was openly gay.

Defendants deny the remaining allegations in Paragraph 44 of the Complaint.

**COMPLAINT ¶45:**

Sundgaard reported that he had experienced "mistreatment, double standards, and singling out" throughout his tenure at the station.  Sundgaard noted that he received this warning only after he brought up concerns about diversity and inclusion and after the scheduling issue was resolved.  Sundgaard suggested that the warning was an attempt by Helmke to intimidate him out of reporting up the chain, including to TEGNA corporate.

**ANSWER:**  Defendants admit Plaintiff alleged in his August 22, 2017 complaint that he experienced "mistreatment, double standards, and singling out" throughout his tenure at the Station and suggested that the warning was an attempt by Helmke to intimidate him

out of reporting up the chain, including to TEGNA corporate.  Defendants deny the

remaining allegations in Paragraph 45 of the Complaint.

## COMPLAINT ¶46:

In the end, TEGNA determined that there was sufficient staff for him to attend the conference and approved his request for time off.

**ANSWER:**  Defendants admit that the Station approved Plaintiff's time off for

September 7, 2017.  Defendants deny the remaining allegation in Paragraph 46 of the

Complaint.

## COMPLAINT ¶47:

Sundgaard's mother passed away just hours before he was to leave for the conference, so ultimately, he was unable to attend.

**ANSWER:**  Defendants admit the allegations in Paragraph 47 of the Complaint.

## COMPLAINT ¶48:

Less than three months later, on November 20, 2017, Remes, Helmke, and Mills issued Sundgaard a final written warning.

**ANSWER:**  Defendants admit that on November 21, 2017 Plaintiff was issued a final

written warning.  Defendants deny the remaining allegations in Paragraph 48 of the

Complaint.

## COMPLAINT ¶49:

This warning alleged that Sundgaard exercised "poor judgment" when four days earlier, during a newscast, he commented on a story about whether Minnesota or Wisconsin had more lakes.  At the end of the story in which it was explained that even though Wisconsin has no limit as to the size of a body of water it counts as a lake, Minnesota still has more lakes, Sundgaard commented with a statement to the effect of, "Hmm, I guess size really does matter."

**ANSWER:**  Defendants admit the allegations in Paragraph 49 of the Complaint.

**COMPLAINT ¶50:**

Cohosts and other staff in the studio laughed and nodded in agreement.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 50 of the Complaint.

**COMPLAINT ¶51:**

According to the warning, Sundgaard's "sexually loaded" comment was
"disrespectful" to the audience and the brand and created an uncomfortable environment
for his cohosts.

**ANSWER:**  Defendants admit the allegations in Paragraph 51 of the Complaint.

**COMPLAINT ¶52:**

None of Sundgaard's cohosts or other staff ever expressed discomfort about the
comment at the time it was made or thereafter.  In fact, his coworkers expressed disbelief
that he was reprimanded about it at all.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief about

whether some of Plaintiff's coworkers expressed disbelief.  Defendants deny the

remaining allegations in Paragraph 52 of the Complaint.

**COMPLAINT ¶53:**

Less than two months after the November 2017 writeup, TEGNA ran and posted a
story about an error made regarding uniforms that had been ordered for the Minneapolis
Super Bowl volunteers.

**ANSWER:**  Defendants admit the allegations in Paragraph 53 of the Complaint.

**COMPLAINT ¶54:**

The story was titled, "Size Matters:  Crew 52 Volunteers Struggle with Ill Fitting
Swag."  This story is still online at www.kare11.com/article/sports/nfl.

**ANSWER:**  Defendants admit the allegations in Paragraph 54 of the Complaint.

**COMPLAINT ¶55:**

Moreover, about two months prior to the November 2017 writeup, TEGNA posted an article titled, "Does Size Matter:  Twitter Trolls Tiny Engagement Ring."  This story is also still online at www.kare11.com/video/entertainment/buzz60.

**ANSWER:**  Defendants admit that the digital video appeared on a KARE-11 site .

Defendants deny the remaining allegations in Paragraph 55 of the Complaint.

**COMPLAINT ¶56:**

After the meeting at which Sundgaard was issued the November 2017 writeup, Sundgaard told Mills that he was not going to be treated and be terminated like Kim Insley ("Insley").

**ANSWER:**  Defendants admit the allegations contained in Paragraph 56 of the Complaint.

**COMPLAINT ¶57:**

Insley was a well-known KARE 11 anchor for twenty-four years before being dismissed without explanation other than that the station wanted to "go in a new direction."  At the time of her termination, Insley was fifty-six years old.  Many viewers believed she was dismissed due to age discrimination, and the topic was widely discussed by viewers online and by other news outlets.  Defendants publicly noted in reference to Insley's departure, "This is in no way a reflection of Kim's many talents."  Insley's departure became known in mid-October.

**ANSWER:**  Defendants admit Insley was a well-known KARE 11 anchor for twenty-four years, that she left her employment with the Station in October 2017, and that the Station stated that "This is in no way a reflection of Kim's many talents" when it announced her departure.  Defendants lack knowledge or information sufficient to form a belief about what "many viewers believed."  Defendants deny the remaining allegations in Paragraph 57 of the Complaint.

**COMPLAINT ¶58:**

Station management, including Remes and Mills, knew about the public and internal chatter regarding discrimination against Insley, as Insley had been terminated just weeks prior to this final warning issued to Sundgaard.  Mills knew that Sundgaard's comment referred to his desire not to be discriminated against.

**ANSWER:**  Defendants deny the allegations in Paragraph 58 of the Complaint.

**COMPLAINT ¶59:**

Sundgaard received no other discipline until his termination in May 2020.

**ANSWER:**  Defendants deny the allegations in Paragraph 59 of the Complaint.

**COMPLAINT ¶60:**

He performed very well, received positive performance reviews, and continued to receive constant positive feedback from a large community following.

**ANSWER:**  Defendants deny the allegations in Paragraph 60 of the Complaint.

**COMPLAINT ¶61:**

At the same time, however, viewers harassed Sundgaard based on his sexual orientation.  He was routinely threatened and subjected to hostility in posts and comments on Facebook, Twitter and other social and news venues.  The harassment and hostility directed at Sundgaard was frequent and public.  TEGNA did nothing to attempt to protect Sundgaard or condemn the hostility.  This continued throughout Sundgaard's employment.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations that Plaintiff was harassed, threatened, or subjected to hostility in an online or public forum as set forth in Paragraph 61 of the Complaint.  Defendants deny the remaining allegations in Paragraph 61 of the Complaint.

**COMPLAINT ¶62:**

Sometime in 2018, TEGNA conducted an anonymous survey that revealed severe cultural issues with the work environment at KARE 11.  It hired a consultant to investigate the workplace culture.

**ANSWER:**  Defendants admit an anonymous culture survey was conducted in 2018.

Defendants deny the remaining allegations in Paragraph 62 of the Complaint.

**COMPLAINT ¶63:**

The consultant assembled employee focus groups and held quarterly meetings to address the issues.  The consultant asked Sundgaard to have a one-on-one conversation with her and Sundgaard welcomed the opportunity telling her that he had, "a lot to say." The scheduled meeting was cancelled due to a snowstorm.  Sundgaard asked to reschedule but he never heard back from the consultant.

**ANSWER:**  Defendants admit one-on-one conversations were conducted with staff in

2018.  Defendants lack knowledge or information sufficient to form a belief about the

truth of the remaining allegations in Paragraph 63 of the Complaint.

**COMPLAINT ¶64:**

In or around October 2018, Director of Content Stuart Boslow ("Boslow") spoke with Sundgaard about a tweet he had posted.  Sundgaard had retweeted a post by NBC's 'Meet the Press' Moderator Chuck Todd that criticized Donald Trump.  Sundgaard added, "It's time to stop making excuses for Trump & fascism - we're really in a test of our democracy & facts & science...."

**ANSWER:**  Defendants admit the allegations in Paragraph 64 of the Complaint.

**COMPLAINT ¶65:**

A few days after this post, Boslow casually invited Sundgaard into his office and told him that he was not being given any kind of warning or discipline, but that he had been told to talk with Sundgaard about the post since Trump was referred to by name. The conversation was light and amicable.

**ANSWER:**  Defendants admit a discussion occurred.  Defendants deny the allegations in

Paragraph 65 of the Complaint.

**COMPLAINT ¶66:**

Soon after, Boslow followed up via email with Remes, Mills, and News Director, Stacey Nogy ("Nogy") to report on the conversation.  Boslow mischaracterized the nature and tenor of the conversation.

**ANSWER:**  Defendants admit Boslow memorialized his conversation with Plaintiff in an email to Remes, Mills, and then News Director Stacy Nogy ("Nogy").  Defendants deny the remaining allegations in Paragraph 66 of the Complaint.

**COMPLAINT ¶67:**

Boslow wrote to Remes, Mills and Nogy that the two discussed Sundgaard's alleged history of similar behavior and past discipline for it, and that Sundgaard acknowledged his violation of station policy.

**ANSWER:**  Defendants admit the allegations in Paragraph 67 of the Complaint.

**COMPLAINT ¶68:**

No discussion of any past conduct occurred in that meeting and no discussion of station policy was had.

**ANSWER:**  Defendants deny the allegations in Paragraph 68 of the Complaint.

**COMPLAINT ¶69:**

Throughout Sundgaard's employment, TEGNA inconsistently applied its social media policies.

**ANSWER:**  Defendants deny the allegations in Paragraph 69 of the Complaint.

**COMPLAINT ¶70:**

TEGNA's Social Media Policies forbid posting, reposting, sharing, or retweeting "anything that could compromise TEGNA's reputation," as well as "comments that include discriminatory remarks, harassment, threats of violence or similar content." These guidelines apply to all TEGNA employees.

**ANSWER:**  Defendants admit the allegations in Paragraph 70 of the Complaint quote some, but not all, of the language in its Social Media Policy.

**COMPLAINT ¶71:**

According to some policies, news and editorial employees are not allowed to post political commentary without prior management approval and must clearly label such posts as opinion or commentary.  The policy also encourages news and editorial

employees to consider whether their posts are "true, fair, necessary, and informative," and condemns personal attacks and abusive language.

**ANSWER:**  Defendants admit the allegations in Paragraph 71 of the Complaint quote

some, but not all, of the language in its Social Media Policy.

## COMPLAINT ¶72:

Management, as well as on-air talent, have repeatedly violated such policies through their own posts and by "liking" others' posts indicating their approval.  This includes but is not limited to liking posts and videos featuring nude women, describing anti-LGBTQ people as "insolent adults whining...", criticizing NBC for using the word "protest" rather than "riot" in the wake of the George Floyd killing, criticizing Minnesota Governor Tim Walz and Mayor Jacob Frey's responses to the protests, praising Donald Trump's State of the Union address and referring to Nancy Pelosi as an "embarrassment and a "national disgrace."

**ANSWER:**  Defendants deny the allegations in Paragraph 72 of the Complaint.

## COMPLAINT ¶73:

Other TEGNA employees who have and continue to publicly engage with social media in apparent violation of TEGNA's alleged policies have not been disciplined and remain employed by TEGNA.

**ANSWER:**  Defendants deny the allegations in Paragraph 73 of the Complaint.

## COMPLAINT ¶74:

On or around April 19, 2020, Sundgaard reposted a post written by his rabbi, Michael Adam Latz ("Rabbi Latz") on Facebook.  Rabbi Latz commented on the COVID-19 stay-at-home order protests referring to some of the Michigan protesters as "nazi sympathizers" and "armed extremists."

**ANSWER:**  Defendants admit that Plaintiff reposted a post written by Rabbi, Michael

Adam Latz on Facebook that referred to attendees at state capitol rallies protesting the

COVID-19 stay-at-home orders as, among other things, "Nazi sympathizer gun fetishist

miscreants" and "armed extremists."  Defendants deny the remaining allegations in

Paragraph 74 of the Complaint.

**COMPLAINT ¶75:**

Rabbi Latz's comment was based on anti-Semitic protest signs.  As Jewish men, Rabbi Latz and Sundgaard are sensitive to these matters and take their historical importance very seriously.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 75 of the Complaint.

**COMPLAINT ¶76:**

During approximately the next eleven days, the repost did not receive much attention from the public.

**ANSWER:**  Defendants deny the allegations in Paragraph 76 of the Complaint.

**COMPLAINT ¶77:**

On or around April 29, 2020, a conservative news outlet published the repost, mischaracterizing the facts and berating Sundgaard.

**ANSWER:**  Defendants admit that on April 29, 2020, Alpha News Minnesota

republished Plaintiff's repost.  Defendants deny the remaining allegations in Paragraph

77 of the Complaint.

**COMPLAINT ¶78:**

In a post on the Reopen Minnesota Facebook group, the administrator posted with the hashtag "#FireSven" and provided the KARE 11 phone number for members of the group to call.

**ANSWER:**  On information and belief, Defendants admit the allegations in Paragraph 78

of the Complaint.

**COMPLAINT ¶79:**

Other members of the group posted about flooding KARE 11's Facebook, boycotting the network, and even contacting advertisers to put pressure on the station.

**ANSWER:** Defendants admit the allegations in Paragraph 79 of the Complaint.

**COMPLAINT ¶80:**

As a result, Sundgaard received a slew of threats and brazenly homophobic comments and messages on social media.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 80 of the Complaint.

**COMPLAINT ¶81:**

The frenzy quickly escalated to a public condemnation on Twitter by a former congressman. This person referred to Sundgaard's repost as "idiocy" and called for TEGNA to fire him.

**ANSWER:** Defendants admit the allegations in Paragraph 81 of the Complaint.

**COMPLAINT ¶82:**

The same night, Sundgaard removed the repost from his Facebook page.

**ANSWER:** Defendants admit Plaintiff removed the post from his Facebook page. Defendants lack knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 82 of the Complaint.

**COMPLAINT ¶83:**

The next day, April 30, 2020, Mills and Boslow called Sundgaard about the repost. Boslow asked Sundgaard what he was thinking.

**ANSWER:** Defendants admits that Mills and then Director of Content Stuart Boslow ("Boslow") called Plaintiff on April 30, 2020 to discuss his Facebook post and violations of the Station's Social Media Policy. Defendants lack knowledge or information sufficient to form a belief regarding the truth of the remaining allegations in Paragraph 83 of the Complaint.

**COMPLAINT ¶84:**

Sundgaard responded that as Jewish men, Sundgaard and Rabbi Latz are sensitive to these issues, and Rabbi Latz does not use the word "nazi" lightly.  He explained that the issue Rabbi Latz's post addressed was not the protests condemning the stay-at-home orders, but the protest signs displaying swastikas and comparing Jews to rats captioned with the statement, "that's the real plague."

**ANSWER:**  Defendants admit that Plaintiff stated that he and Rabbi Latz are sensitive to these issues.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84 of the Complaint.

**COMPLAINT ¶85:**

Sundgaard explained to Mills and Boslow that the negativity surrounding the post was incited by alt-right groups eleven days after he reported and was directed at him personally.

**ANSWER:**  Defendants deny the allegations in Paragraph 85 of the Complaint.

**COMPLAINT ¶86:**

Sundgaard told Boslow and Mills that he feared for his safety because he had received threats of physical harm.  He quoted some of the hateful messages and offered to forward them.

**ANSWER:**  Defendants admit that Plaintiff told Boslow and Mills that he feared for his safety and alleged that he had received threats within the last 24 hours.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 86 of the Complaint.

**COMPLAINT ¶87:**

Sundgaard expressed regret about the repost and told Boslow and Mills he would be sticking to posting about weather from then on.  He told them he never wanted to be targeted by these groups again and he was willing to discuss a remedy that would stop the hostility.

**ANSWER:**   Defendants admit that Plaintiff expressed regret to Boslow and Mills and said that he would be sticking to posting about weather from then on.  Defendants deny the remaining allegations in Paragraph 87 of the Complaint.

**COMPLAINT ¶88:**

The next day Remes summarily dismissed Sundgaard.

**ANSWER:**  Defendants admit Sundgaard was discharged on May 1, 2020.  Defendants deny the remaining allegations in Paragraph 88 of the Complaint.

**COMPLAINT ¶89:**

On May 1, 2020, Remes called Sundgaard, along with Boslow and Mills.  Remes read Sundgaard's termination letter aloud, claiming Sundgaard's repost allegedly violated TEGNA policies.

**ANSWER:**  Defendants admit Remes, Mills, and Boslow called Plaintiff on May 1, 2020 and that Remes informed Plaintiff that his post violated the Station's policies.

Defendants deny the remaining allegations in Paragraph 89 of the Complaint.

**COMPLAINT ¶90:**

Sundgaard responded that he was planning on resigning in response to the current situation because of the organization's pattern of failing to support him in past instances of discrimination, as well as its decision to placate far-right/alt-right fringe groups rather than stand behind a long-time employee.

**ANSWER:** Defendants admit that Plaintiff stated that he resigned and accused the Station of discrimination and not supporting him.  Defendants deny the remaining allegations in Paragraph 90 of the Complaint.

**COMPLAINT ¶91:**

Sundgaard also noted that Defendants did not apply its social media or other policies uniformly among its employees.  Finally, Sundgaard told TEGNA that it should expect to hear from his lawyer.

**ANSWER:**  Defendants deny that Plaintiff made the allegations in Paragraph 91 of the

Complaint during the May 1, 2020 telephone call.

**COMPLAINT ¶92:**

Just thirty minutes later, TEGNA publicly announced Sundgaard's termination on Facebook.

**ANSWER:**  Defendants admit that on May 1, 2020 the Station announced that Plaintiff

was no longer employed by the Station on Facebook.  Defendants deny the remaining

allegations in Paragraph 92 of the Complaint.

**COMPLAINT ¶93:**

The post stated:  "Due to continued violations of KARE 11's news ethics and other policies, we have made the decision to part ways with Sven Sundgaard.  We hope you continue to turn to KARE 11 for your news, traffic, weather, and more."

**ANSWER:** Defendants admit the allegations in Paragraph 93 of the Complaint.

**COMPLAINT ¶94:**

The statement was not only facially false, but the result was that viewers were led to believe that Sundgaard had behaved unethically or worse, several times and continuously.

**ANSWER:**  Defendants deny the allegations in Paragraph 94 of the Complaint.

**COMPLAINT ¶95:**

Sundgaard demanded TEGNA remove the post, but TEGNA did not respond.

**ANSWER:**  Defendants admit that Plaintiff demanded that the Station remove the post

and that the Station did not respond.  Defendant deny the remaining allegations in

Paragraph 95 of the Complaint.

**COMPLAINT ¶96:**

Just hours after it was published, other news outlets reported on Sundgaard's termination and circulated TEGNA's post.

**ANSWER:**  Defendants admit that other news outlets circulated the Station's post and reported on Plaintiff's departure from the Station.  Defendants deny the remaining allegations in Paragraph 96 of the Complaint.

**COMPLAINT ¶97:**

The re-publishing prompted more comments and discussion online.  Within the week, coverage of the story was global.

**ANSWER:**  Defendants admit Plaintiff's departure from the Station was reported on. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 97 of the Complaint.

**COMPLAINT ¶98:**

TEGNA's public announcement of Sundgaard's separation was unprecedented and a departure from customary practice in its content and in the manner and to whom it was communicated.

**ANSWER:**  Defendants deny the allegations in Paragraph 98 of the Complaint.

**COMPLAINT ¶99:**

Never during Sundgaard's employment with TEGNA did it terminate another employee in such a public and damaging manner.

**ANSWER:**  Defendants deny the allegations in Paragraph 99 of the Complaint.

**COMPLAINT ¶100:**

There is no known history of TEGNA publishing such detailed alleged reasons for separations—true or untrue.  In fact, in December 2020, after terminating an employee, Nogy told the press "I'm sorry, but we don't comment on personnel issues."

**ANSWER:**  Defendants admit that when asked for more details about former KARE-11 employee's departure, Nogy stated "I'm sorry, but we don't comment on personnel issues."  Defendants deny the remaining allegations in Paragraph 100 of the Complaint.

**COMPLAINT ¶101:**

TEGNA's enforcement of its social media policies on Sundgaard was unprecedented and a departure from customary practice.

**ANSWER:** Defendants deny the allegations in Paragraph 101 of the Complaint.

**COUNT I**
**SEXUAL ORIENTATION DISCRIMINATION**
**IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT**

**COMPLAINT ¶102:**

Plaintiff re-alleges all preceding paragraphs of this Complaint.

**ANSWER:** Defendants incorporate their answers to the allegations of Plaintiff's

Complaint as thought fully set forth herein.

**COMPLAINT ¶103:**

Defendants, by and through employees, managers, and officials acting within the scope of their employment and on behalf of Defendants, unlawfully discriminated against Plaintiff in violation of Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq*. These practices include, but are not limited to, terminating Plaintiff's employment, subjecting Plaintiff to a hostile environment and altering the terms and conditions of his employment because of his sexual orientation.

**ANSWER:** Defendants deny the allegations in Paragraph 103 of the Complaint.

**COMPLAINT ¶104:**

Defendants' conduct constitutes discrimination in employment on the basis of sexual orientation in violation of Minn. Stat § 363A.01 *et seq*.

**ANSWER:** Defendants deny the allegations in Paragraph 104 of the Complaint.

**COMPLAINT ¶105:**

Defendants' discriminatory actions adversely affected Plaintiff's status as an employee and ultimately led to Plaintiff's termination.

**ANSWER:** Defendants deny the allegations in Paragraph 105 of the Complaint.

**COMPLAINT ¶106:**

Defendants failed to take all reasonable steps to prevent discrimination against Plaintiff from occurring.

**ANSWER:** Defendants deny the allegations in Paragraph 106 of the Complaint.

**COMPLAINT ¶107:**

Defendants' discriminatory actions were intentional and performed with malice and/or reckless indifference to Minnesota's anti-discrimination laws that protect Plaintiff.

**ANSWER:** Defendants deny the allegations in Paragraph 107 of the Complaint.

**COMPLAINT ¶108:**

As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other serious damage.

**ANSWER:** Defendants deny the allegations in Paragraph 108 of the Complaint.

**COUNT II**
**SEXUAL ORIENTATION HOSTILE ENVIRONMENT**
**IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT**

**COMPLAINT ¶109:**

Defendants, by and through employees, managers, and officials acting within the scope of their employment and on behalf of Defendants, unlawfully subjected Plaintiff to hostility and threats based upon his sexual orientation.  Defendants failed to provide a work environment free from animus directed at Plaintiff based upon his sexual orientation.

**ANSWER:** Defendants deny the allegations in Paragraph 109 of the Complaint.

**COMPLAINT ¶110:**

Defendants' conduct and its failures to act constitutes violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.*

**ANSWER:**  Defendants deny the allegations in Paragraph 110 of the Complaint.

**COMPLAINT ¶111:**

Defendants' actions and inactions adversely affected Plaintiff's status as an employee and ultimately led to Plaintiff's termination.

**ANSWER:**  Defendants deny the allegations in Paragraph 111 of the Complaint.

**COMPLAINT ¶112:**

Defendants failed to take all reasonable steps to prevent discrimination against Plaintiff from occurring.

**ANSWER:**  Defendants deny the allegations in Paragraph 112 of the Complaint.

**COMPLAINT ¶113:**

Defendant's discriminatory actions were intentional and performed with malice and/or reckless indifference to Minnesota's anti-discrimination laws that protect Plaintiff.

**ANSWER:**  Defendants deny the allegations in Paragraph 113 of the Complaint.

**COMPLAINT ¶114:**

As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other serious damages.

**ANSWER:**  Defendants deny the allegations in Paragraph 114 of the Complaint.

**COUNT III**
**REPRISAL IN VIOLATION OF**
**THE MINNESOTA HUMAN RIGHTS ACT**

**COMPLAINT ¶115:**

Plaintiff re-alleges all preceding paragraphs of this Complaint.

**ANSWER:**  Defendants incorporate their answers to the allegations of Plaintiff's

Complaint as thought fully set forth herein.

**COMPLAINT ¶116:**

Defendants by and through managers and employees acting on behalf of Defendants and within the scope of their employment, retaliated against Plaintiff in violation of the Minnesota Human rights Act, Minn. Stat. 363A.01 *et seq*. These practices include, but are not limited to, engaging in retaliatory conduct like reprimanding Plaintiff, inhibiting his professional development, terminating Plaintiff's employment, departing from customary employment practices, publishing false, damaging statements about Plaintiff because of Plaintiff's good faith reports to Defendants of discrimination and harassment in violation of the Minnesota Human Rights Act.

**ANSWER:**  Defendants deny the allegations in Paragraph 116 of the Complaint.

**COMPLAINT ¶117:**

Defendants' unlawful and retaliatory employment practices and actions were intentional and were performed by Defendants with malice and/or reckless indifference to the anti-discrimination laws which protect Plaintiff.

**ANSWER:**  Defendants deny the allegations in Paragraph 117 of the Complaint.

**COMPLAINT ¶118:**

Defendants failed to take all reasonable steps to prevent retaliation against Plaintiff from occurring.

**ANSWER:**  Defendants deny the allegations in Paragraph 118 of the Complaint.

**COMPLAINT ¶119:**

As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other serious damages.

**ANSWER:**  Defendants deny the allegations in Paragraph 119 of the Complaint.

**COUNT V[sic]**
**DEFAMATION**

**COMPLAINT ¶120:**

Plaintiff re-alleges all preceding paragraphs of this Complaint.

**ANSWER:** Defendants incorporate their answers to the allegations of Plaintiff's Complaint as thought fully set forth herein.

**COMPLAINT ¶121:**

Defendants' actions constitute defamation and defamation per se.

**ANSWER:** Defendants deny the allegations in Paragraph 121 of the Complaint.

**COMPLAINT ¶122:**

Defendants, by and through employees, managers, and officials acting within the scope of their employment and on behalf of Defendants, published a false, defamatory statement about Plaintiff to third parties.

**ANSWER:** Defendants deny the allegations in Paragraph 122 of the Complaint.

**COMPLAINT ¶123:**

This includes, statements made on May 1, 2020, when Defendants publicly stated that Plaintiff had ended Sundgaard employment because he "continued to engage in violations of KARE 11's news ethics and other policies" within his profession, journalism.

**ANSWER:** Defendants deny the allegations in Paragraph 123 of the Complaint.

**COMPLAINT ¶124:**

Defendants' actions were intentional and intended to harm Plaintiff in his profession.

**ANSWER:** Defendants deny the allegations in Paragraph 124 of the Complaint.

**COMPLAINT ¶125:**

Defendants' actions were performed with actual malice, malice and/or reckless indifference to Plaintiff's right not to be defamed under Minnesota common law.

**ANSWER:** Defendants deny the allegations in Paragraph 125 of the Complaint.

**COMPLAINT ¶126:**

Defendants refused to remove the false and defamatory statement from social media and permitted the false allegations to permeate social media and news media worldwide.

**ANSWER:**  Defendants deny the allegations in Paragraph 126 of the Complaint.

**COMPLAINT ¶127:**

As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of wages and benefits, and other serious damages and has harmed Plaintiff's reputation and lowered Plaintiff in the estimation of the community.

**ANSWER:**  Defendants deny the allegations in Paragraph 127 of the Complaint.

**PRAYER FOR RELIEF:**

**ANSWER:**

Therefore, Plaintiff requests that judgment be entered against Defendants for the following:

    a.    Declaring that Defendants' acts or omissions described in this Complaint constitute violations of applicable federal and state laws which protect Plaintiff;

    b.    Enjoining Defendants and its employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries and all other persons acting in concert or participation with it, from its unlawful acts;

    c.    Requiring Defendants to make Plaintiff whole for its adverse, retaliatory, and discriminatory actions with compensatory damages and with interest of an appropriate inflation factor;

    d.    Plaintiff be awarded front pay and the monetary value of any employment benefits to which he would have been entitled to as an employee of Defendants;

    e.    Plaintiff be awarded compensatory damages in an amount to be established at trial;

    f.    Plaintiff be awarded damages for mental and emotional anguish and suffering, humiliation, embarrassment, shame, and loss of enjoyment of life in an amount to be established at trial;

    g.    Plaintiff be awarded punitive damages as provided by statute in an amount to be established at trial;

      h.      Plaintiff be awarded treble damages pursuant to the Minnesota Human Rights Act;

      i.      Awarding Plaintiff attorneys' fees, costs, and disbursements pursuant to statute; and

      J.      Granting other and further relief as the Court deems fair and equitable.

**ANSWER:** Defendants deny that Plaintiff is entitled to the relief requested, included the relief requested in subparagraphs a.-f. or any relief whatsoever.

All allegations of the Complaint not otherwise answered above are denied.

**JURY DEMAND:**

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS.

**ANSWER:** Defendants admit Plaintiff demands a trial by jury.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative and other defenses without assuming any burden of production or proof that it would not otherwise have:

### First Affirmative Defense

1.      Without conceding that Plaintiff has suffered any damages, Plaintiff's own conduct caused, in whole or in part, whatever damages he may have suffered.

### Second Affirmative Defense

2.      Plaintiff's claims are barred to the extent he seeks to base claims on events occurring outside the applicable statute of limitations.

### Third Affirmative Defense

3.      Plaintiff's claims are barred to the extent that he failed to meet any administrative and/or statutory prerequisites to filing suit.

## Fourth Affirmative Defense

4.      Defendants deny that Plaintiff's sexual orientation or any other protected characteristic was a factor or motive in any of the employment decisions concerning Plaintiff. However, in the event that the fact finder determines otherwise, Defendants aver that they would have made the same decisions even in the absence of any alleged impermissible factor/motivation for legitimate business reasons.

## Fifth Affirmative Defense

5.      Plaintiff's claims are barred, in whole or in part, because Defendants promulgated firm policies against discrimination, harassment, and retaliation and otherwise exercised reasonable care to prevent and correct promptly any alleged discrimination, harassment, and retaliation, and Plaintiff unreasonably failed to promptly take advantage of the preventive or corrective opportunities provided or to avoid harm otherwise.

## Sixth Affirmative Defense

6.      Subject to proof through discovery, Plaintiff has failed to adequately mitigate his purported damages.

## Seventh Affirmative Defense

7.      Plaintiff is not entitled to punitive damages because he cannot demonstrate by clear and convincing evidence that the acts of the Defendants show a willful indifference to the rights or safety of others because of its good faith efforts to comply with applicable law.

**Eighth Affirmative Defense**

8.   Before and throughout the relevant period, Defendants maintained and complied with well-established policies, programs, and procedures for the prevention and detection of unlawful discrimination, harassment, or retaliatory conduct by its employees.

**Ninth Affirmative Defense**

9.   Plaintiff is not entitled to punitive or treble damages because Defendants made good faith efforts to comply with all applicable statutes and common laws and acted at all times to protect Plaintiff's rights under the Minnesota Human Rights Act ("MHRA") and any other applicable anti-discrimination law.

**Tenth Affirmative Defense**

10.   The statements about which Plaintiff complains are not provably false assertions of material fact, but rather are protected opinion and thus not actionable.

**Eleventh Affirmative Defense**

11.   Even if the statements about which Plaintiff complains were factual in nature, they are true or substantially true.

**Twelfth Affirmative Defense**

12.   The statements about which Plaintiff complains are not actionable because Plaintiff is a public figure, the statements at issue concerned a matter of public concern, and the statements were not published with actual malice - *i.e.*, with knowledge of falsity or reckless disregard for the truth.

## Thirteenth Affirmative Defense

13.   The statement about which Plaintiff complains did not damage Plaintiff's reputation in a manner sufficient to support his claim.

## RESERVATION OF RIGHTS

Defendants reserves the right to amend their answer and to assert any additional affirmative or other defenses as may become available or apparent at a future date.

**WHEREFORE**, Defendants pray that the Court enter judgment:

1.   dismissing the Complaint in its entirety with prejudice;

2.   granting to Defendants such other and further relief that the Court may deem just and proper.

**DATED:** April 22, 2021          Respectfully submitted,

Defendants MULTIMEDIA HOLDINGS CORPORATION, a licensee of KARE-TV and d/b/a KARE-11 and TEGNA Inc.

By: */s/Camille A. Olson*
*One of Its Attorneys*

*Admitted pro hac vice:*
Camille A. Olson
Richard B. Lapp
Christina Jaremus
Seyfarth Shaw LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000
colson@seyfarth.com
rlapp@seyfarth.com
cjaremus@seyfarth.com
*Attorneys for Defendants*

Sean R. Somermeyer
Kristin Jones Pierre
Faegre Drinker Biddle & Reath LLP
220 Wells Fargo Center, 90 South Seventh
Street
Minneapolis, Minnesota 55402
Telephone:  (612) 766-7875
Facsimile:  (612) 766 1600
sean.somermeyer@faegredrinker.com
kristen.pierre@fargredrinker.com
*Local Counsel for Defendants*

## CERTIFICATE OF SERVICE

I, Camille Olson, hereby certify that on April 15, 2021, I caused the Defendants' Answer and Affirmative Defenses to Plaintiff's Complaint (with the Notice of Electronic Filing):

*[Check the box, below, that applies to how you served the above documents.]*

☑   to be filed electronically with the Clerk of Court through ECF; and

☑   that I caused a copy of the foregoing documents to be served by email at the following email addresses:

Joni M. Thome (*jthome@baillonthome.com*)
Frances E. Baillon (*fbaillon@baillonthome.com*)
Baillon Thome Jozwiak & Wanta LLP
100 South Fifth Street, Suite 1200
Minneapolis, Minnesota 55402

**DATED:** April 22, 2021          Respectfully submitted,

Defendants MULTIMEDIA HOLDINGS
CORPORATION, a licensee of KARE-TV and
d/b/a KARE-11 and TEGNA Inc.

By: */s/Camille A. Olson*
      Camille Olson